**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

DONNA MARIE GALLANT,

                        Plaintiff,

    vs.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                      Defendant.        Case No. 3:16-cv-00258-SLG

## DECISION AND ORDER

On November 26, 2008, Donna Marie Gallant filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act") respectively,[1] alleging disability beginning September 20, 2008.[2] On April 22, 2009, the Social Security Administration ("SSA") determined that Ms. Gallant was disabled as of September 20, 2008.[3] On April 5, 2012, the SSA determined that Ms. Gallant was no longer disabled due to medical improvement.[4] Ms. Gallant has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[5]

---

[1] The Court uses the term "disability benefits" to include both disability insurance and SSI.

[2] Administrative Record ("A.R.") 244, 249.

[3] A.R. 92.

[4] A.R. 94–98.

[5] Docket 1 (Gallant's Compl.) at 2.

The Commissioner filed an Answer and a brief in opposition to Ms. Gallant's opening brief.[6] Ms. Gallant filed a reply brief.[7] Oral argument was held on September 20, 2017. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[8] For the reasons set forth below, Ms. Gallant's request for relief will be denied and the decision of the agency will be affirmed.

## I. STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[9] This standard of review applies to the agency's determination on whether a claimant continues to be disabled.[10] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[11] Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[12] In reviewing the agency's determination, the

---

[6] Docket 13 (Answer); Docket 24 (Defendant's Br.).

[7] Docket 27 (Gallant's Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Hiller v. Astrue,* 687 F.3d 1208 (9th Cir. 2012).

[11] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[12] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[13] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[14] A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which she did not rely."[15] Finally, an ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[16]

## II. TERMINATION OF DISABILITY BENEFITS

Once a claimant has been found to be entitled to disability benefits, the SSA conducts periodic reviews to evaluate the claimant's continued eligibility to receive benefits.[17] If upon review the Commissioner finds that a claimant is no longer disabled, her benefits may be terminated.[18] However, disability benefits may only be terminated if substantial evidence demonstrates (1) "there has been any medical improvement in the

---

[13] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[14] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[15] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[16] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[17] 20 C.F.R. §§ 404.1594(a), 416.994(a).

[18] 42 U.S.C. § 423(f)(4).

claimant's impairment" and (2) the claimant "is now able to engage in substantial gainful activity."[19]  Such determination is made "on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."[20]

To determine whether there has been medical improvement, an ALJ must "compare the current medical severity" of the claimant's impairment to the medical severity of the impairment "at the time of the most recent favorable medical decision that the claimant was disabled or continued to be disabled."[21]  Medical improvement is defined as "any decrease in the medical severity" of the claimant's impairment and requires "comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)."[22]

In an effort to ensure that disability reviews are uniform, the SSA follows an eight-step evaluation process under Title II and a seven-step process under Title XVI.[23]  The steps, and the ALJ's findings in this case, are as follows:

---

[19] 42 U.S.C. § 423(f)(1).

[20] 42 U.S.C. § 423(f)(4).

[21] 20 C.F.R. § 404.1594(b)(7).

[22] 20 C.F.R. §§ 404.1594(b)(2), 404.1594(c)(1).

[23] 20 C.F.R. §§ 404.1594(f), 416.994(b)(5).

**Title II, Step 1.** For the Title II claim, the ALJ must determine if the claimant is engaging in substantial gainful activity. If the claimant is performing substantial gainful activity and any applicable trial work period has been completed, the claimant is no longer disabled (20 CFR 404.1594(f)(1)). For the Title XVI claim, the performance of substantial gainful activity is not a factor used to determine if the claimant's disability continues (20 CFR 416.994(b)(5)). *As of April 5, 2012, the date on which the agency had determined Ms. Gallant's disability ended, the ALJ determined that Ms. Gallant had not engaged in substantial gainful activity.[24]*

**Title II, Step 2 and Title XVI, Step 1.** At step two for the Title II claim and step one for the Title XVI claim, the ALJ must determine whether the claimant has an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. If the claimant does, her disability continues. *The ALJ determined that Ms. Gallant has not had an impairment or combination of impairments that meets or medically equals a listing since April 5, 2012.[25]*

**Title II, Step 3 and Title XVI, Step 2.** At step three for the Title II claim and step two for the Title XVI claim, the ALJ must determine whether medical improvement has occurred by comparing the current medical severity of a claimant's impairment with the severity at the time of the most recent favorable medical determination of disability.

_____

[24] A.R. 27.

[25] A.R. 27.

Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs or laboratory findings (20 CFR 404.1594(b)(1) and 416.994(b)(1)(i)). If medical improvement has occurred, the analysis proceeds to the fourth step for the Title II claim and the third step for the Title XVI claim. If not, the analysis proceeds to the fifth step for the Title II claim and the fourth step for the Title XVI claim. *The ALJ determined that medical improvement had occurred as of April 5, 2012. He noted a decrease in treatment for mental health related symptoms. He also referenced neuropsychological testing revealed no more than minimal limitations and treatment records revealed no clinical evidence of significant mental impairment related limitations.*[26]

**Title II, Step 4 and Title XVI, Step 3.** At step four for the Title II claim and step three for the Title XVI claim, the ALJ must determine whether medical improvement is related to the ability to work. Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities. If it is related, the analysis proceeds to the sixth step for the Title II claim and the fifth step for the XVI claim. *The ALJ determined that Ms. Gallant's medical improvement is related to the ability to work "because it has resulted in an increase in [Ms. Gallant]'s residual functional capacity."*[27]

---

[26] A.R. 30.

[27] A.R. 30.

**Title II, Step 5 and Title XVI, Step 4.**    At step five for the Title II claim and step four for the Title XVI claim, the ALJ must determine if an exception to medical improvement applies.  There are two groups of exceptions.  If one of the first group of exceptions applies, the analysis proceeds to the next step.  If one of the second group of exceptions applies, the claimant's disability ends.  If none apply, the claimant's disability continues.  *Because the ALJ concluded at step four for the Title II claim and step three for the Title XVI claim that Ms. Gallant's medical improvement is related to her ability to work, step five for Title II and step four for Title XVI were not addressed by the ALJ in his decision.*

**Title II, Step 6 and Title XVI, Step 5.**    At step six for the Title II claim and step five for the Title XVI claim, the ALJ must determine whether all the claimant's current impairments in combination are severe.  If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer disabled.  If they do, the analysis proceeds to the next step.  *The ALJ determined that as of April 5, 2012, Ms. Gallant had the following current impairments:  "status-post polytrauma to the head, osteoarthritis of the right ankle, status-post right wrist fracture and repair, status post left hip fracture and repair, mood disorder, anxiety disorder, and cognitive/post-concussive disorder with chronic headaches."[28]    The ALJ found Ms.*

---

[28] A.R. 27.

*Gallant's current impairments are severe "because, singly or in combination, they impose more than minimal limitations on [Ms. Gallant]'s ability to perform basic work activities."*[29]

**Title II, Step 7 and Title XVI, Step 6.** At step seven for the Title II claim and step six for the Title XVI claim, the ALJ must assess the claimant's residual functional capacity based on the current impairments and determine if she can perform past relevant work. If the claimant can perform past relevant work, she is no longer disabled. If not, the analysis proceeds to the last step. *The ALJ determined that beginning on April 5, 2012, based on current impairments, Ms. Gallant had the RFC to perform sedentary work except that Ms. Gallant is limited to frequent climbing of ramps or stairs and balancing; occasional climbing of ladders, ropes or scaffolds, and crouching; and frequent, not constant, handling and fingering with the right upper extremity. She must avoid concentrated exposure to non-weather related extreme cold, wetness, excessive noise, and unprotected heights, avoid moderate exposure to excessive vibration, and work is limited to 1-3 step tasks involving only few workplace changes.*[30]

*The ALJ also determined that Ms. Gallant has no past relevant work.*[31]

**Title II, Step 8 and Title XVI, Step 7.** At the last step, the ALJ must determine whether other work exists that the claimant can perform, given her residual functional capacity and considering her age, education, and past work experience. If the claimant

---

[29] A.R. 30.

[30] A.R. 30–31.

[31] A.R. 26.

can perform other work, she is no longer disabled.  If the claimant cannot perform other work, her disability continues.   In order to support a finding that an individual is not disabled at the final step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given her residual functional capacity, age, education, and work experience.[32] *The ALJ determined that beginning on April 5, 2012, considering Ms. Gallant's age, education, work experience, and RFC based on the current impairments, Ms. Gallant is able to perform a significant number of jobs in the national economy including receptionist, telephone solicitor, and telephone information clerk.[33]*

The ALJ concluded that Ms. Gallant's disability ended on April 5, 2012, and she has not become disabled again since that date to the date of the ALJ's decision.[34]

### III.    PROCEDURAL AND FACTUAL BACKGROUND

Ms. Gallant was born in 1988; she was 23 years old on April 5, 2012.  Ms. Gallant was seriously injured in a car accident on September 20, 2008.  Prior to the accident, she had obtained her high school diploma and a certificate in drywall finishing.  She had

---

[32] A.R. 27; *see Parra v. Astrue,* 481 F.3d 742, 748 (9th Cir. 2007); *Bellamy v. Sec. of Health & Human Serv.,* 755 F.2d 1380, 1381 (9th Cir. 1985) ("Once a claimant has been found to be disabled, however, a presumption of continuing disability arises in her favor.  The Secretary then bears the burden of producing evidence sufficient to rebut this presumption of continuing disability. This evidence must be produced before the Secretary can even consider the medical-vocational guidelines . . . and is reviewed under the 'substantial evidence' standard.") (citations omitted).

[33] A.R.  40–41.

[34] A.R. 41-42.

worked as a cook for one year prior to the accident.[35]  Ms. Gallant filed applications for

disability benefits on November 26, 2008.[36]  On April 22, 2009, Ms. Gallant was found to

be disabled beginning on September 20, 2008.[37]  After a subsequent case review, Ms.

Gallant was informed that she was no longer considered disabled as of April 5, 2012.[38]

She requested reconsideration of the decision on May 11, 2012.[39]  On May 22, 2013,

following a reconsideration hearing, a Disability Hearing Officer upheld the determination

that Ms. Gallant was no longer disabled as of April 5, 2012 due to medical improvement.[40]

Ms. Gallant filed a request for hearing before an ALJ.[41]  That hearing was held before ALJ

Paul Hebda on January 27, 2014 in Anchorage, Alaska.[42]  In his decision of March 21,

2014, the ALJ determined that Ms. Gallant's disability ended on April 5, 2012.[43]  As part

of his decision, the ALJ incorrectly identified May 22, 2013 as the relevant comparison

point decision ("CPD") date for determining medical improvement.  The Appeals Council

---

[35] A.R. 770.

[36] A.R. 244, 249.

[37] A.R. 92.  The disability determination form from April 22, 2009 stated the primary diagnosis was "affective/mood disorders," with a secondary diagnosis of "anxiety disorders."  The accompanying documentation references Ms. Gallant's traumatic brain injury.  A.R. 125.

[38] A.R. 100.

[39] A.R. 141.

[40] A.R. 154–161.

[41] A.R. 170.

[42] A.R. 49.

[43] A.R. 42.

noted and the parties agree that the CPD date of May 22, 2013 is incorrect.[44] The Appeals Council denied Ms. Gallant's request for review on September 2, 2016.[45] Ms. Gallant appealed to this Court.[46]

*Medical Records of Ms. Gallant's Traumatic Brain Injury*

On September 20, 2008, Ms. Gallant was involved in a horrific motor vehicle accident. She suffered multiple injuries and lost her unborn child. She had fractures to her hip, wrist, and ankle, as well as a traumatic brain injury.[47] A CT scan of Ms. Gallant's head on September 20, 2008 "showed no intracranial bleeds though there is some gas in the facial tissues."[48]

A follow-up CT scan of Ms. Gallant's head on September 21, 2008 showed "multiple tiny foci of abnormal high density in the bilateral frontal regions consistent with contusions" with the largest contusion "within the left frontal lobe and measures 8 mm."

---

[44] A.R. 27. The correct CPD is April 22, 2009, the date of the initial disability determination for Ms. Gallant. *See* A.R. 92; 147 (noting CPD as April 22, 2009). In its order denying review, the Appeals Council acknowledged that the ALJ had referred to an incorrect CPD and "lists a mental impairment different from the traumatic brain injury impairment that formed the basis for the earlier determination." However, the Council found "the decision corrects this error by acknowledging a post concussive syndrome (Finding 4) and providing extensive rationale showing improvement in the traumatic brain injury." A.R. 2. Ms. Gallant noted in her brief that the ALJ did not specify the correct date of the point of comparison and the list of Ms. Gallant's impairments at the actual comparison point was incorrect. Docket 23 at 19. The Commissioner concedes these errors. Docket 24 at 15. The parties disagree whether these errors are harmless. Docket 23 at 19–22; Docket 24 at 15–18; Docket 27 at 5–6.

[45] A.R. 1.

[46] Docket 1–5.

[47] A.R. 421–424, 431–439, 449–453.

[48] A.R. 451.

The report also noted that "[t]here remains a large right frontoparietal subgaleal hematoma."[49]

A September 23, 2008 CT scan indicated that the "[s]cattered petechial hemorrhages throughout the frontal lobes are improving or resolved." The subcortical hematoma was observed as "stable in size," but the "[s]urrounding edema has progressed slightly."[50]

On September 24, 2008, Ms. Gallant was interviewed briefly by Mark Samson, M.D. He noted that Ms. Gallant "only responds to me in one or two-word answers." At the time of the interview she did not understand that she no longer had a child and requested to go home because she had "a little one at home I have to take care of."[51]

A September 25, 2008 CT scan showed a "substantial premalar soft tissue hematoma overlying the zygoma and the right maxilla."[52]

On October 2, 2008, Ms. Gallant was transferred to an intensive inpatient rehabilitation unit, where she stayed for 8 days. On admission, she saw Dong Cho, M.D. Dr. Cho reported that Ms. Gallant was "alert with good preservation of attention span and communication so that she can answer most of the simple questions immediately and the patient has good oral expression" but that her "high cognition showed still significant

---

[49] A.R. 575.

[50] A.R. 678.

[51] A.R. 656–57.

[52] A.R. 681.

impairment." Dr. Cho observed that "[a]t the present time the patient is level VI/X of the Rancho Los Amigos of head trauma recovery, presenting confused but appropriate behavior" and that Ms. Gallant had "goal-oriented behavior" and "can respond appropriately to the situation, but [Ms. Gallant] has incorrect response because of memory impairment and the patient requires verbal cues and direction for most of the activities." He concluded that Ms. Gallant was "totally disabled at the present time, she cannot return to any kind of productive work or schooling for a long time, up to one year."[53]

On October 9, 2008, the CT scan showed "interval decrease in previously seen bilateral frontal lobe hemorrhagic foci."[54]

In his October 10, 2008 discharge report, Dr. Cho wrote that Ms. Gallant was "very nice and courageous," but had "significant residual deficits, particularly cognitive impairment due to the traumatic brain injury." He noted that "[e]ven though the patient was making improvement, still she had quite impaired high cognition, insight and problem solving, and [she] still overestimates her capacity. [Ms. Gallant] showed impulsivity and mild organizational problems."[55]

On October 22, 2008, Ms. Gallant received an occupational therapy assessment from Denise McGowen, OTR/L. Ms. McGowen observed that Ms. Gallant's "[m]emory

---

[53] A.R. 733, 737–38.

[54] A.R. 638.

[55] A.R. 641–42.

appears to be intact, [Ms. Gallant is] able to recall recommendations from therapist and that she is not to drive."[56]

Also on October 22, 2008, Ms. Gallant saw Anne Godwin, MA, CCC-SLP for a speech-language-cognitive assessment. Ms. Godwin found that Ms. Gallant "presents with functional speech-language-cognitive-swallowing skills" and that "[t]herapy is not warranted at this time."[57]

On November 25, 2008, Ms. Gallant had a follow up visit with Dr. Cho. He observed that Ms. Gallant "showed very good conversation during the examination, with functional attention span and working memory," but she "still has low endurance and is easily distracted." He concluded, "overall she is making good improvement." He rated Ms. Gallant at a level VIII/X on the Rancho Los Amigos head trauma recovery scale.[58]

Ms. Gallant had sought mental health counseling shortly before the motor vehicle accident on September 10, 2008 at Mat-Su Health Services. She reported then that she was homeless, living in her vehicle, and had had crying episodes and difficulty sleeping.[59] After the accident, she next returned to Mat-Su Health Services for a counseling session on November 19, 2008.[60]

---

[56] A.R. 620.

[57] A.R. 627–28.

[58] A.R. 728.

[59] A.R. 696. The record from that visit indicates that Ms. Gallant had previously obtained counselling at Mat-Su Health Services in 1999 and 2005; she was diagnosed with depression and PTSD.

[60] A.R. 719–21.

On December 3, 2008, Ms. Gallant saw a staff person at Mat-Su Health Services who reported that "[Ms. Gallant]'s mom was concerned about client's functioning, memory and impairment of decision making. [Ms. Gallant]'s mom however could not give specifics on [Ms. Gallant]'s impulsivity or high risk decisions."[61] On December 5, 2008, Ms. Gallant attending a therapy session at Mat-Su Health Services; she also met with staff on December 10, 2008 to practice calming techniques.[62]

Ms. Gallant next returned to Mat-Su Health Services for a therapy session on February 2, 2009. On that date, the therapist noted that Ms. Gallant "denies having mood swings as mom reported."[63] She attended additional counseling appointments on February 9 and February 16, 2009.[64]

At Ms. Gallant's next appointment on February 27, 2009, the counsellor observed that Ms. Gallant's "mood was euthymic" and her "insight and judgment [are] improving—going slow on relationships." Ms. Gallant reported she was pursuing books, crosswords, etc. to improve her cognition. [65]

Ms. Gallant had one more therapy session at Mat-Su Health Services on March 12, 2009. The counsellor observed that Ms. Gallant's "affect was somewhat flat and she

---

[61] A.R. 717,

[62] A.R. 716, 714.

[63] A.R. 762.

[64] A.R. 761, 760.

[65] A.R. 758.

was somewhat depressed," but that Ms. Gallant "is experiencing her grief appropriately and 'normally.'"[66]  There is no record of any additional mental health counselling in 2009.

As noted above, on April 22, 2009, the SSA found Ms. Gallant to be disabled as of September 20, 2008.[67]

On January 14, 2010, Richard Fuller, Ph.D., conducted a neuropsychological evaluation of Ms. Gallant.  Dr. Fuller interviewed Ms. Gallant, her mother, and her stepfather.  He reviewed Ms. Gallant's records and conducted a battery of tests.  Ms. Gallant told Dr. Fuller that "she continues to have mild problems with short-term memory, but primarily does not notice any significant cognitive difficulties.  She did state that she can be somewhat moodier and gets irritable and has less patience with things than she used to, but she does not engage in any aggressive behavior."  Dr. Fuller found that Ms. Gallant's Verbal IQ was 94, her Performance IQ was 114, and her Full-Scale IQ was 104. He found that Ms. Gallant's academic functioning, learning, and memory were all low-average to average for her age, her attention and concentration was mildly deficient to average, her mental processing was "faster than average," and her language functioning was below average to average.  Dr. Fuller found that Ms. Gallant's motor speed was slow, but her fine motor coordination was high-average for her dominant right hand and average for motor speed and coordination in her nondominant left hand.  Dr. Fuller assigned a GAF of 65.  He opined:

---

[66] A.R. 756.

[67] A.R. 92.

> [B]y her own admission as well as reports from her mother and stepfather, she is more irritable, more prone to using profanity, and less empathetic. These characteristics are consistent with frontal lobe brain damage, and thus appear to be a function of the TBI and subsequent vascular damage she experienced from the MVA. There apparently is some differential moodiness, in that she becomes less annoyed with her stepfather than with her mother over the same issue, and thus, she appears to have some control over her emotional reactions.

Dr. Fuller concluded that "Ms. Gallant's cognitive abilities are remarkably intact, and thus, she does not seem to have any limitations as far as returning to work." He recommended ongoing individual psychotherapy to address ongoing bereavement issues and to develop "positive coping strategies."[68]

On January 20, 2010, Ms. Gallant had one counseling session at Mat-Su Health Services. The counsellor observed that Ms. Gallant "presented good hygiene [and] grooming." She reported that Ms. Gallant "is at odds [with] her parents and is working on becoming her own payee and eventually returning to work." She also reported that Ms. Gallant "continues to strive for autonomy" and "appears fully competent to this writer."[69]

Beginning in January of 2011, Ms. Gallant saw D. Glen Elrod, M.D., at Sleeping Lady Women's Health Care for prenatal visits. At each of these visits, Dr. Elrod noted that "[Ms. Gallant] appears to be doing well." At a six-week postpartum check-up on August 18, 2011, Dr. Elrod reported that Ms. Gallant "notes no current complaints" and was in "no acute distress."[70]

---

[68] A.R. 765–772.

[69] A.R. 845.

[70] A.R. 791, 806–16. Ms. Gallant visited Dr. Elrod on January 10, 2011, February 14, 2011, March 14, 2011, April 11, 2011, April 25, 2011, May 11, 2011, May 25, 2011, June 8, 2011, June 15, 2011,

The next mental health counseling record is from September 7, 2011, when Ms. Gallant contacted Mat-Su Health Services to report that she was starting to get depressed as it was nearing the anniversary of her daughter's death.[71] However, at a therapy session on September 12, 2011, the counsellor described Ms. Gallant's mood as "bright," and with "congruent affect." She reported Ms. Gallant "continues to experience memory loss per her report." The counsellor also reported that Ms. Gallant "continues to struggle [with] health and pain although cognitively she is much improved."[72] There are no further records of counseling at Mat-Su Health Services after that date.

On January 23, 2012, Ms. Gallant participated in a psychiatric evaluation by David Holladay, M.D., as part of the SSA review of Ms. Gallant's disability determination. Ms. Gallant's mother accompanied her to the evaluation. Ms. Gallant's chief reported complaint at that visit was her physical disabilities: "I feel like my physical disabilities limit me. I can't walk, sit, or stand before my hip and ankle hurt especially if it's cold out." Dr. Holladay observed that Ms. Gallant was "easily oriented to time place, person." He also observed that her "[s]peech is in the normal range for rate and volume," her "[c]ognitive function is judged to be overall in the average range but was not formally tested," "[g]eneral mood appears to be happy or euthymic," and her "[a]ffect [was] consistent." Dr. Holladay noted that Ms. Gallant's "[i]nsight and judgment appear to be good" and her

June 22, 2011, June 29, 2011, and August 18, 2011.

[71] A.R. 837–41.

[72] A.R. 842-43.

"[t]hought processes are logical and goal directed." He reported that Ms. Gallant "has been off Lexapro for 2 years without mood problems." He concluded, "[a]t this point, anxiety disorder symptoms and mood disorder symptoms are minimal and not significantly impacting social or occupational functioning." But Dr. Holladay also noted that "[t]he full impact of Ms. Gallant's head injury on her current functioning is difficult to determine on the basis of this evaluation." He added that "Ms. Gallant and I agree, her physical difficulties at this point are probably more impairing than her cognitive and psychiatric symptoms . . . Ms. Gallant's psychiatric problems are probably interfering with her ability to function socially and occupationally at a mild or low level." Dr. Holladay determined that Ms. Gallant had a GAF score of "probably 48, although difficult to determine." He recommended ongoing individual therapy and stated that "[c]onsideration might be given to a repeat neuropsychological evaluation to make a determination regarding these more subtle and complex cognitive problems."[73]

On March 5, 2012, Ms. Gallant saw Susan Klimow, M.D., for a consultative examination at the request of the SSA. Ms. Gallant reported that her chief complaints were her right wrist, right ankle, and left hip pain. Ms. Gallant reported "[s]he is independent with activities of daily living and a mother of an 8-month-old daughter, which she is able to care for." Dr. Klimow noted that Ms. Gallant had a traumatic brain injury with reported memory defects. She observed that Ms. Gallant "follows multistep commands consistently," that "her speech is clear," "[s]he is oriented x 4," and "[t]here is

---

[73] A.R. 847–50. Lexapro is used to treat depression and anxiety. https://www.webmd.com/drugs/2/drug-63990/lexapro-oral/details (last visited February 15, 2018).

no evidence of aphasia." Dr. Klimow also noted no physical deficits that would impact Ms. Gallant's ability to do future work activities. She also found "no mental impairment limiting [Ms. Gallant]'s ability to reason or make occupational, personal or social adjustments."[74]

On March 11, 2012, Jay Caldwell, M.D., reviewed Ms. Gallant's records to complete a physical residual functional capacity assessment for the SSA. He determined that Ms. Gallant was able to occasionally lift and/or carry thirty-five pounds, frequently lift and/or carry ten pounds; stand and/or walk for a total of at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and frequently push and/or pull in the upper and lower extremities.[75]

On April 5, 2012, Ms. Gallant began seeing Loetta Woods, D.O., as her primary care provider.[76] Dr. Woods observed that Ms. Gallant was "verbally appropriate and able to follow simple requests" and that "[Ms. Gallant] is in no acute distress." Dr. Woods reported that Ms. Gallant "[d]enies memory loss, disorientation, syncope, diplopia, dizziness, vertigo, clumsiness, paresthesias, or cephalgia" and that Ms. Gallant "reports headaches and mood changes." Ms. Gallant stated her headaches have not changed in "duration or intensity since the accident" and it "is a constant headache." Dr. Woods recommended continuing with ibuprofen for Ms. Gallant's headaches and considering

---

[74] A.R. 857–59.

[75] A.R. 864.

[76] April 5, 2012 is also the date that the SSA determined Ms. Gallant was no longer disabled. A.R. 42.

"being evaluated by a neurologist in the future to determine if she has migraine headaches." Dr. Woods also recommended that Ms. Gallant obtain mental health care "to help find new skills in her changing environment," but Ms. Gallant stated she was "not interested in a mental health care provider to help deal with the grief that she is expressing."[77]

On June 21, 2012, Ms. Gallant returned to Dr. Woods and reported severe headaches. She added that "the mood swings are something that have been with her ever since the accident." Dr. Woods noted that "[Ms. Gallant] states that the headaches also are associated with her mood swings," but "that since she was placed on the Celexa she has found that the mood swings have stabilized also." Dr. Woods reported that Ms. Gallant denied vision changes, memory loss, disorientation, syncope, diplopia, dizziness, vertigo, clumsiness, paresthesias, or cephalgia. Dr. Woods noted that "[Ms. Gallant] was consulted for 25 minutes about the need to consider being seen by a mental health care provider to learn to cope with some of the issues that seem to remain since the motor vehicle accident." At this visit, the record indicates Ms. Gallant expressed interest in such care.[78]

---

[77] A.R. 871–73. This medical record from April 5, 2012 appears to be the earliest reference to headaches in the record.

[78] A.R. 907–08. Celexa is used to treat depression. https://www.webmd.com/drugs/2/drug-8603/celexa-oral/details (last visited February 15, 2018).

On July 26, 2012, Ms. Gallant had a magnetic resonance angiography (MRA) of the circle of Willis and an MRI of the brain, both performed at the Alaska Brain Center, LLC. The MRA showed "normal anatomy." The MRI of the brain was also normal.[79]

On July 27, 2012, Ms. Gallant saw Dr. Woods at a follow up visit. At this visit, Ms. Gallant's primary concern was right ankle pain; she also reported that she is "constantly feeling out of sorts." Dr. Woods reported that Ms. Gallant "states that her depression is continuing to be a major problem for her," but that "she is not interested in an antidepressant" and "not interested in being seen by a mental health care provider." Dr. Woods reported that Ms. Gallant "[d]enies memory loss, disorientation, syncope, diplopia, dizziness, vertigo, clumsiness, paresthesias, or cephalgia" and "is able to complete her ADLs independently." Dr. Woods again recommended that Ms. Gallant seek mental health counseling; at this visit, Ms. Gallant reported she was not interested. There is no reference to headaches at this office visit.[80]

On August 9, 2012, Ms. Gallant saw Dr. Woods again. Dr. Woods reported that Ms. Gallant "has been taking the antidepressant that was recently prescribed for her." Ms. Gallant reported "intense headaches" that occur "at least four times a month," but that "she is not interested in taking medication to prevent these," and that "she has not used any type of medication for migraine headaches." She indicated "the light affects her when she is having one of these headaches." Dr. Woods asked Ms. Gallant to start a

---

[79] A.R. 900–02.

[80] A.R. 910.

headache diary. At the visit, Ms. Gallant again denied "memory loss, disorientation, syncope, diplopia, dizziness, vertigo, clumsiness, paresthesias, or cephalgia."[81]

On August 21, 2012, the State agency consulting physician, Wandal Winn, M.D., reviewed Ms. Gallant's medical records and based on that review, determined that "there is no evidence of any disabling impairment, physical or mental."[82]

On September 7, 2012, Ms. Gallant saw Jeffrey Sponsler, M.D., a neurologist at the Alaska Brain Center, LLC. Dr. Sponsler assessed Ms. Gallant with migraines, complicated grief, and PTSD. He recommended that Ms. Gallant obtain additional neuropsychological testing, consider using Effexor for headache prevention and depression treatment, and "continue counseling and psychiatry for complicated grief, PTSD."[83]

On February 7, 2013, Ms. Gallant next saw Dr. Woods. Dr. Woods reported that Ms. Gallant "states she has a migraine headache two or three times a month," but that the "Maxalt that has been prescribed for her in the past has been very helpful." Dr. Woods noted that "if she catches these headaches early enough she doesn't have any problem with them." Ms. Gallant also reported that the medication she had been prescribed for depression had resulted in "stabilized emotion," and "she is very pleased with the

---

[81] A.R. 912–13.

[82] A.R. 879.

[83] A.R. 880–82. Effexor is used to treat depression. https://www.webmd.com/drugs/2/drug-1836/effexor-oral/details (last visited February 15, 2018).

medication." At the visit, Ms. Gallant again "states that she is not interested in being seen by a mental health care provider."[84]

On May 2, 2013, Ms. Gallant next saw Dr. Woods; she complained of congestion, facial pain, and headaches. Ms. Gallant reported that she continued to use Maxalt "whenever she has a headache." Dr. Woods also noted that Ms. Gallant "states that she has been in to see a neurologist for her migraine headaches and he indicated that these are typical migraine headaches and that she will probably have them most of her life." She was diagnosed with sinusitis and prescribed an antibiotic.[85]

On July 15, 2013, Ms. Gallant saw Dr. Woods for a follow up visit. She complained that day primarily of depression. She told Dr. Woods that she was "looking for disability to [be] extended" because she has "many issues that have not been resolved since the motor vehicle accident," which "continue[ ] to keep her from working."[86]

On August 21, 2013, Ms. Gallant saw Russell Cherry, PsyD, for a neuropsychological evaluation. Dr. Cherry interviewed both Ms. Gallant and her mother, and conducted a battery of neuropsychological tests. Ms. Gallant told Dr. Cherry that with Maxalt, she was then having migraines "only 1-2 times per month." Dr. Cherry concluded that "on a measure of judgment for health and safety, [Ms. Gallant]'s performance was

---

[84] A.R. 915–17. Maxalt is used to treat migraines. It helps to relieve headache, pain, and other migraine symptoms (including nausea, vomiting, sensitivity to light/sound). https://www.webmd.com/drugs/2/drug-8440/maxalt-oral/details (last visited February 15, 2018).

[85] A.R. 918.

[86] A.R. 921.

within normal limits, 84th percentile, which is a performance consistent with adults who are able to live independently." Ms. Gallant described her mood as "I don't know – normal," but Ms. Gallant's mother described her daughter's mood as "more noteworthy for hostility." Her mother reported in the interview that Ms. Gallant "will often misperceive others and react strongly" and "described significant angry outbursts, where the patient will yell or slam doors, which occurs approximately every several days, which is very atypical for the patient." Dr. Cherry noted that Ms. Gallant's mother "rated [Ms. Gallant]'s overall adaptive functioning in the severely impaired range, 0.6 percentile, which is below the expected level." During the interview, Ms. Gallant reported that her hobbies and interests included "playing video games, horseback riding, singing karaoke, listening to music, doing artistic activities, and reading, but [Ms. Gallant] noted that she is doing less art due to being busy with demands of parenting." She also reported that she had been "involved in a relationship with her partner for 3 years and denied any significant relational problems." Dr. Cherry reported Ms. Gallant's ABAS-II summary as follows: impaired communication, community use, functional academics, and self-direction; low average home living and health and safety; and borderline leisure, self-care and social skills. Dr. Cherry noted that "[Ms. Gallant]'s overall performance across neuropsychological domains was entirely within normal limits." In his diagnostic interpretation, Dr. Cherry reported:

> With regard to diagnosis of Mood Disorder Due to TBI-Mixed, [Ms. Gallant] and her mother endorsed numerous symptoms of mood disorder during the interview, the patient has prior diagnoses of depressive disorder and a long history of treatment for that, the patient has a familial history of issues with depression, and the patient's traumatic brain injury that resulted in extensive frontal lobe damage and lengthy posttraumatic amnesia would typically

result in some persisting mood disorder for the majority of adults. Additionally, the patient appears to have had some intermittent issues with depression during childhood/adolescence due to abuse and some family chaos, yet her mood issues were greatly exacerbated by TBI, with the patient's mother describing a marked personality change where she went from "passive/quiet" to "angry/aggressive," which [is] very common for individuals with mood disorder from brain injury. Unfortunately, it appears that some clinicians and social security staff have concluded that since her recent MRI scan [was] described as normal, her mood issues have resolve[d], but among TBI literature there are studies that show persisting mood and personality changes even after MRI scans normalize.[87]

Dr. Cherry recommended Ms. Gallant reapply for social security disability, but also noted, "with the right supports, and better stabilization of mood/sleep, the patient could be successful with competitive employment in the future." Dr. Cherry opined that "[Ms. Gallant]'s mood issues appear to be the most disabling condition from a neuropsychological perspective, with attentional deficits only somewhat limiting."[88]

On August 22, 2013, Ms. Gallant next saw Dr. Woods; her chief complaint on that day was an upper respiratory infection. Ms. Gallant reported that "overall she has been doing quite well." Dr. Woods again recommended Ms. Gallant obtain mental health counseling and Ms. Gallant again stated she was "not interested in being seen by a mental health provider."[89]

*Testimony and Third Party Reports*

The April 22, 2009 Disability Determination for Ms. Gallant included mental

---

[87] A.R. 895.

[88] A.R. 884–899.

[89] A.R. 924–25.

limitations with an onset date of September 20, 2008. A consultant at that time noted Ms. Gallant had mental limitations that were "severe enough to preclude all unskilled work" and she was "not capable of performing other work."[90] The SSA's consultant noted that "my clinical experience is that many people with brain injuries have limited insight into their difficulties" and "in consideration on all of the issues in this claim, especially, the severity of [Ms. Gallant]'s TBI, apparently marginal pre-injury adjustment, suggestion from recent mental health notes that [Ms. Gallant] is having a hard time coping, consistent with 3 P ADLs, I think that we have sufficient medical and other evidence to conclude at least mod[erate] limits in Daily Living and Social functioning, marked limits in CPP and an MRFC indicating that [Ms. Gallant] could not maintain adequate pace and persistence on a consistent basis and could not adequately cope with routine stresses and hassles in the workplace."[91]

In a function report dated March 25, 2012, Ms. Gallant reported that in social activities, she gets angry and frustrated easily. She also reported that she gets along "just fine" with authority figures. She added that she "can't handle much stress." [92]

In a function report dated March 28, 2012 by Ms. Gallant's mother, she describes Ms. Gallant as being "very different now . . . her temper flares easily," "con[cen]tration on tasks take[s] longer, and frustration overwhelms her," and she does "not remember

---

[90] A.R. 127–28.

[91] A.R. 125.

[92] A.R. 277–84.

conversations she will have with me." Ms. Gallant's mother also reported that Ms. Gallant follows written and spoken instructions "fairly well," but does not handle stress well.[93]

On April 5, 2012, the Disability Determination Unit concluded that Ms. Gallant was no longer disabled, that her mental impairments were non-severe, and that she was capable of working at sedentary, unskilled jobs. In making this analysis, the Disability Determination Unit used April 2009 as the CPD date.[94]

At the January 27, 2014 hearing before the ALJ, Ms. Gallant testified that she is a "full-time mom," lives with her boyfriend and daughter in an apartment, has her driver's license, dresses and bathes herself, is the primary cook in her household, and does the grocery shopping, dishes and laundry. She testified that she gets migraines two times per week and that they last for three to four hours, she takes migraine and antidepressant medications, but the migraine medication "tends to make me sick." She testified that "I definitely have memory problems" and that "I get very confused and lost kind of easily." She also testified that "I get very frustrated easily, I've noticed" and "[i]f something isn't going right or something just bothers me, I get – I get mad and angry very easily."[95] Her sister testified at the hearing that Ms. Gallant's temper had gotten

---

[93] A.R. 290–292.

[94] A.R. 100–02.

[95] A.R. 59–63, 66, 69–70.

worse, that "[s]he can go from being happy to really frustrated very easily."[96]

## IV.  DISCUSSION

Ms. Gallant asserts that her disability benefits should be reinstated and continue because "the residual effects of [her] traumatic brain injury continue to prevent her from working."  Specifically, Ms. Gallant alleges that the ALJ's decision:  (1) "erred fundamentally in disregarding the findings of Ms. Gallant's most recent and thorough neurological examination"; (2) "erred in its analysis of Ms. Gallant's credibility"; and (3) "erred in its analysis of medical improvement."[97]  The Commissioner maintains that the ALJ:  (1) "properly rejected Dr. Cherry's opinion"; (2) "properly rejected [Ms. Gallant]'s subjective complaints as not entirely credible"; and (3) "[Ms. Gallant] has not demonstrated reversible harmful error in the ALJ's analysis of medical improvement."[98]

### A.    Dr. Cherry's Opinion

#### 1.    *Legal Standard.*

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[99]  Medical opinions come from three types of sources: those who treat the claimant;  those who examine but do not treat the claimant;  and those who neither

---

[96] A.R. 80.

[97] Docket 23 at 1–24.

[98] Docket 24 at 3–21.

[99] 20 C.F.R. §§ 404.1527(b), 416.927(c).  Sections 404.1527 and 416.927 apply to claims filed before March 27, 2017.  Ms. Gallant initially filed her application for disability on November 26, 2008; accordingly, the Court applies §§ 404.1527 and 416.927 to her claim.

examine nor treat the claimant.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[100]  The opinion of an examining physician "is, in turn, entitled to greater weight than the opinion of a nonexamining physician."[101]

However, the ALJ is responsible for determining credibility and resolving conflicts and ambiguities in medical testimony.[102]  Factors relevant to evaluating any medical opinion, including an examining physician such as Dr. Cherry, are:  (1) the consistency of the medical opinion with the record as a whole; (2) the physician's area of specialization; (3) the supportability of the physician's opinion through relevant evidence; and (4) other relevant factors, such as the physician's degree of familiarity with the SSA's disability process and with other information in the record.[103]

As recently explained by the Ninth Circuit,

> To reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence. If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.  The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making

---

[100] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[101] *Lester,* 81 F.3d at 830.

[102] *Lewis v. Apfel,* 236 F.3d 503, 509 (9th Cir. 2001) (citing *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998)).

[103] 20 C.F.R. § 416.927(c)(2).  This section applies to claims filed before March 27, 2017.  *See* § 416.325.

findings. Additionally, the opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician.[104]

### 2.     Analysis

Ms. Gallant asserts that the ALJ "erred fundamentally in disregarding the findings of Ms. Gallant's most recent and thorough neurological examination."[105]  Specifically, she argues that the ALJ erred in rejecting Dr. Cherry's opinion that Ms. Gallant's "mood issues are her most disabling condition from a neuropsychological perspective."[106]  Additionally, she argues that in the Ninth Circuit, "courts use a 'clear and convincing' standard to review an Administrative Law Judge's rejection of treating physicians' opinions."[107]

On August 21, 2013, Dr. Cherry administered multiple neuropsychological tests, reviewed Ms. Gallant's treatment records, and interviewed her and her mother.[108]  Dr. Cherry recommended Ms. Gallant reapply for social security disability, "although with the right supports, and better stabilization of mood/sleep, [she] could be successful with competitive employment in the future."  Further, Dr. Cherry opined that "[Ms. Gallant]'s mood issues appear to be the most disabling condition from a neuropsychological perspective, with attentional deficits only somewhat limiting."  He noted other clinicians

---

[104] *Revels v. Berryhill*, 874 F.3d 648, 654–55 (9th Cir. 2017) (internal citations and quotations omitted).

[105] Docket 23 at 13.

[106] Docket 23 at 13–16.

[107] Docket 23 at 14–15.

[108] A.R. 884–899.

had said Ms. Gallant's mood "should be entirely normal based on the fact that her MRI was normal, although MRI is not useful in diagnosis of mood disorder or ADHD, and MRI is also insensitive to subtle persisting effects from traumatic brain injury."[109] In his letter of July 14, 2014 to the SSA,[110] Dr. Cherry noted that Ms. Gallant's symptoms were "suggestive of hypomania, which is also part of mood disorder, including periods of prolonged agitation where she cannot identify why she is angry, severe mood swings, racing random thoughts, hyperverbality, and reduced need for sleep at times."[111] He noted that "[h]er mother described a marked personality change following her motor vehicle accident, describing the patient as "always passive/quiet," but after the accident, she is more "angry/aggressive."[112]

The ALJ found Dr. Cherry's opinion regarding the disabling impact of Ms. Gallant's mood disorder "without evidentiary support" and gave it no weight.[113] Dr. Cherry was an examining source; he did not provide treatment to Ms. Gallant. Because Dr. Cherry's

---

[109] A.R. 884–899.

[110] The letter of July 14, 2014 was submitted by Ms. Gallant's counsel to the Appeals Council on August 1, 2014. The Ninth Circuit has held that "when a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence." *See Brewes v. Comm'r of Soc. Sec. Admin.,* 682 F.3d 1157, 1159–60 (9th Cir. 2012); *see also Taylor v. Commissioner of Social Security Administration,* 659 F.3d 1228, 1233 (9th Cir. 2011).

[111] A.R. 342.

[112] A.R. 887, 928.

[113] A.R. 38.

opinion regarding the severity of Ms. Gallant's mood disorder was contradicted by the opinions of examining physicians Dr. Fuller and Dr. Holladay, the ALJ may only reject the opinion of Dr. Cherry for specific and legitimate reasons supported by substantial evidence in the record.[114]

The ALJ set out five reasons for discounting Dr. Cherry's opinion that Ms. Gallant's mood disorder was disabling. First, the ALJ found that "as Dr. Cherry noted, neuropsychological testing revealed average intellectual and academic functioning; the results of which are consistent with an earlier evaluation."[115] This is a specific and legitimate reason to reject Dr. Cherry's opinion that Ms. Gallant's mood disorder was disabling. And there is substantial evidence in the record that Ms. Gallant's "performance on tasks of academic achievement generally fell in the Average range," as Dr. Cherry himself found.[116] Other doctors made similar clinical observations.[117]

---

[114] *Revels v. Berryhill*, 874 F.3d 648, 654–55 (9th Cir. 2017) (internal citations and quotations omitted).

[115] A.R. 38.

[116] A.R. 892.

[117] For example, on October 22, 2008, after "informal" testing, Dr. Cho assessed Ms. Gallant's auditory comprehension, verbal expression, reading comprehension, written expression, cognition, organization, memory, and social judgment as "with[in] functional limits." A.R. 627. After extensive neuropsychological testing on January 14, 2010, Dr. Fuller found that Ms. Gallant's Verbal IQ was 94, her Performance IQ was 114, and her Full-Scale IQ was 104. Dr. Fuller found that Ms. Gallant's academic functioning and learning and memory were low-average to average for her age, her attention and concentration was mildly deficient to average, her mental processing was "faster than average," and language functioning was below average to average. A.R. 768–69.

Second, the ALJ found that "Dr. Cherry reported no clinical observations in support of his opinion regarding Ms. Gallant's 'mood issues.'"[118]  A review of Dr. Cherry's report shows no issues with Ms. Gallant's mood during the evaluation.  Although this finding by the ALJ would not constitute substantial evidence on its own to support the ALJ's rejection of Dr. Cherry's opinion, it is a specific and legitimate reason that supports the ALJ's decision.

Third, the ALJ noted a normal MRI and found that "while 'TBI literature' may describe persisting mood and personality changes despite normal MRI findings, this is not necessarily the case here, though I acknowledge that [Ms. Gallant] continues to experience related limitations, if not as severe as Dr. Cherry believes."[119]  Although a normal MRI may not, by itself, constitute substantial evidence on which to support the ALJ's rejection of Dr. Cherry's opinion, it is another specific and legitimate reason that supports the ALJ's decision.

Fourth, the ALJ found that "Dr. Cherry's opinion [that Ms. Gallant's mood disorder is disabling] is wholly unsupported by documented clinical findings from [Ms. Gallant]'s treatment providers."[120]  But the record does contain some documented clinical findings of a mood disorder – indeed, that was the basis of the original disability determination.  Thus, for the ALJ to state that Dr. Cherry's opinion is "wholly unsupported" is not a

---

[118] A.R. 38.

[119] A.R. 38.

[120] A.R. 38.

legitimate reason for the ALJ's rejection of his opinion. However, this error is harmless. The ALJ legitimately relied on Dr. Fuller's and Dr. Holladay's opinions regarding the severity of Ms. Gallant's mood disorder. Dr. Holladay found her mood disorder to be "mild" and Dr. Fuller opined that Ms. Gallant's "cognitive abilities are remarkably intact, and thus, she does not seem to have any limitations as far as returning to work."[121]

Fifth, the ALJ found that "in the absence of supporting objective and clinical findings, I must assume that Dr. Cherry based his opinion heavily upon [Ms. Gallant]'s subjective reports and [Ms. Gallant]'s mother's subjective reports."[122] Basing a medical opinion on subjective complaints without objective clinical findings may be a specific and legitimate reason for discrediting that opinion, particularly where, as here, the ALJ has found the complainant to be not entirely credible.[123]

In light of the reasons set forth above, the Court finds that the ALJ provided specific and legitimate reasons for rejecting Dr. Cherry's opinion regarding the severity of Ms. Gallant's mood disorder.

---

[121] A.R. 770–72, 850.

[122] A.R. 38. The Court has reviewed and considered Dr. Cherry's July 14, 2014 letter; it does not change the analysis. The letter is simply further explanation of his prior neuropsychological evaluation. Dr. Cherry did not reevaluate Ms. Gallant or make additional clinical observations. A.R. 928–29.

[123] A.R. 32; *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th Cir. 2004).

B.    <u>Ms. Gallant's Credibility</u>

     1.    *Legal Standard*

An ALJ's credibility assessment has two steps.[124] First, the ALJ determines whether the claimant has presented objective medical evidence of an underlying impairment that "could reasonably be expected to produce the pain or other symptoms alleged."[125] Second, "if the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide 'specific, clear and convincing reasons for' rejecting the claimant's testimony regarding the severity of the claimant's symptoms."[126]

In the first step, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."[127] On this point, the ALJ held that Ms. Gallant's mood disorder and cognitive/post-concussive disorder with chronic headaches were medically determinable severe impairments.[128]

In the second step, the ALJ evaluates the intensity and persistence of a claimant's symptoms by considering "all of the available evidence, including [the claimant's] medical

---

[124] *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014).

[125] *Lingenfelter v. Astrue*, 504 F.3d 1028,1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

[126] *Treichler*, 775 F.3d at 1102 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir.1996)).

[127] *Smolen*, 80 F.3d at 1282.

[128] A.R. 27.

history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect her."[129]   If a claimant produces objective medical evidence of an underlying impairment, the ALJ may reject testimony regarding the claimant's subjective pain or the intensity of symptoms, but must provide "specific, clear and convincing reasons for doing so."[130]   The ALJ is required to "specifically identify the testimony from a claimant she or he finds not to be credible and explain what evidence undermines [that] testimony"; general findings are insufficient.[131]

    2.    *Analysis*

    The ALJ found Ms. Gallant's "statements concerning the intensity, persistence and limiting effects" of her current medically determinable impairments were not "entirely credible." Specifically, the ALJ stated, "[Ms. Gallant]'s allegation that she experiences disabling headaches and cognitive limitations is not supported by objective evidence, her treatment seeking behavior, or her treatment providers' observations." [132]

    Ms. Gallant testified that she has migraines, usually twice a week, and takes medication for them.[133]   She also testified to having memory problems, that she "get[s] very confused and lost kind of easily" and "do[es]n't understand a lot of what's going

---

[129] 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

[130] *Smolen,* 80 F.3d at 1281.

[131] *Treichler,* 775 F.3d at 1102 (quoting *Holohan v. Massanari,* 246 F.3d 1195, 1208 (9th Cir. 2001)); *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995).

[132] A.R. 32.

[133] A.R. 62–63, 69.

on."  Ms. Gallant testified that she "get[s] very frustrated easily, I've noticed" and "[i]f something isn't going right or something just bothers me, I get – get mad and angry very easily."

The ALJ's adverse credibility finding is supported by objective evidence in the record, including an MRA showing "normal anatomy" and a "normal" MRI of the brain.[134] The CT scans taken soon after the traumatic brain injury showed improvement over a relatively short time period.[135]

Second, Ms. Gallant's treatment seeking behavior suggests an improvement in her mood and cognition.  Ms. Gallant attended seven mental health therapy sessions from November 2008 through March 2009, then had one more therapy session in January 2010 and another in September 2011.[136]  At the neuropsychological evaluation in January 2012 with Dr. Holladay, Ms. Gallant reported that she had "been off Lexapro for 2 years without mood problems."[137]  At medical visits, her treatment providers reported mood problems only infrequently.[138]  Dr. Cherry determined that Ms. Gallant's "overall performance across neuropsychological domains was entirely within normal limits."[139]  He

---

[134] A.R. 900–02.

[135] A.R. 575, 638, 678, 681.  The CT scans were taken on September 21, 2008, September 23, 2008, September 25, 2008, and October 9, 2008.

[136] A.R. 714–18, 719–21, 756–62, 842–45.

[137] A.R. 848.

[138] A.R. 791–92, 806–16, 843, 847, 849.

[139] A.R. 893.

reported that "[a]lthough [Ms. Gallant] and her mother reported significant memory problems, her memory functioning is quite good, sometimes better than peers, with her perceived memory problems appearing best explained by attentional deficits."[140] At most of Ms. Gallant's appointments, Dr. Woods reported that Ms. Gallant denied "memory loss, disorientation, syncope, diplopia, dizziness, vertigo, clumsiness, paresthesias, or cephalgia."[141]

Third, Ms. Gallant first reported that she was suffering from migraines on April 5, 2012.[142] Thereafter, Dr. Woods's treatment notes indicate that the medication she prescribed was effective in treating the migraines. And, although Ms. Gallant testified at the hearing in January 2014 that she has two migraines a week lasting three to four hours and that Maxalt makes her sick,[143] Ms. Gallant reported to Dr. Woods in February 2013 that "she has a migraine headache two or three times a month," but that the "Maxalt that has been prescribed for her in the past has been very helpful."[144]

Based on the foregoing, the Court finds that the ALJ provided specific, clear and convincing reasons supported by substantial evidence in the record for his determination that Ms. Gallant's allegations regarding the severity of her mood disorder,

---

[140] A.R. 896.

[141] A.R. 915–17.

[142] A.R. 904.

[143] A.R. 62–63

[144] A.R. 277–92.

headaches, and cognitive impairments were not wholly credible.

C.    Medical Improvement Analysis

1.    *Legal Standard.*

"The Commissioner may not terminate disability benefits without making findings demonstrating that a claimant has medically improved to the point that she is able to perform either her past work or "other work" existing "in significant numbers."[145] Medical improvement is defined as "any decrease in the medical severity" of a claimant's impairment and requires a "comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)."[146]  The Ninth Circuit has noted that "Congress enacted the medical improvement standard as a safeguard against the arbitrary termination of benefits."[147]

To assess medical improvement, the ALJ should compare the medical severity of the impairment "present at the time of the most recent favorable medical decision" to the current medical severity of that impairment.  The most recent favorable medical determination is known as the comparison point decision ("CPD").[148] The Ninth Circuit has found that "[m]aking this comparison is straightforward in ordinary termination

---

[145] *Hayden v. Barnhart,* 374 F.3d 986, 994 (10th Cir. 2004) (citing 20 C.F.R. § 404.1594 (f)(7)–(8)).

[146] *Id.* at 875 (citing 20 C.F.R. § 404.1594(c)(1)).

[147] *Attmore v. Colvin,* 827 F.3d 872, 876 (9th Cir. 2016).

[148] 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i).

cases where the ALJ finds a claimant is disabled (or continues to be disabled) in one decision and, in a later decision, finds the claimant has medically improved." [149]

If the ALJ determines that medical improvement has occurred, he next determines if such medical improvement is related to the claimant's ability to do work.[150] Medical improvement is related to the claimant's ability to work if "there has been a decrease in the severity" of the impairment and "an increase in [the claimant's] functional capacity to do basic work activities."[151] To make this determination, the ALJ follows a two-step process. First, the ALJ assesses the claimant's RFC based on the current severity of the impairment at issue. Then, the ALJ compares the claimant's new RFC to the RFC at the CPD.[152] Finally, if the claimant is able to perform her past work or other work, given her RFC and considering her age, education, and past work experience, she is no longer disabled.[153]

### 2. Mood Disorder

Ms. Gallant argues that "[t]he Decision should have considered, but did not consider, Ms. Gallant's improvement in terms of the comparison points to which the statutes and regulations call attention." Specifically, Ms. Gallant argues that the ALJ failed to accurately determine the comparison point date – the date on which Ms.

---

[149] *Attmore,* 827 F.3d at 876.

[150] 20 C.F.R. §§ 404.1594(b)(3), 416.994(b)(2)(ii)

[151] 20 C.F.R. §§ 404.1594(b)(3), 416.994 (b)(1)(iii).

[152] 20 C.F.R. §§ 404.1594(c)(3)(ii), 416.994(b)(2)(iii).

[153] 20 C.F.R. §§ 404.1594(f)(7), 416.994(b)(5)(vi); 20 C.F.R. §§ 404.1594(f)(8), 416.994(b)(5)(vii).

Gallant was most recently determined to be disabled.[154] At the outset of the ALJ's decision, it states, "[t]he most recent favorable medical decision finding that the claimant was disabled is the determination dated May 22, 2013 [sic]."[155]

The Commissioner acknowledges this statement in the ALJ's decision constitutes error: "the ALJ erred in this regard as the correct CPD in [Ms. Gallant]'s case was instead dated April 22, 2009."[156] The Commissioner maintains this error was harmless because "the ALJ's decision still considered [Ms. Gallant]'s condition as of the appropriate CPD of April 22, 2009 in conducting his analysis by describing [Ms. Gallant]'s condition in much the same way as the hearing officer did."[157] The Court agrees that the erroneous statement at the outset of the ALJ's decision constitutes harmless error. The statement was inconsequential to the ALJ's ensuing reasoned determination. As the Appeals Council correctly noted, the ALJ's decision acknowledged Ms. Gallant's 2008 motor vehicle accident, and provided "extensive rationale showing improvement in the traumatic brain injury" thereafter.[158]

Ms. Gallant also argues that the ALJ inadequately considered whether Ms. Gallant's mood disorder had improved. On this topic, the ALJ stated as follows:

The medical evidence supports a finding that, as of April 5, 2012, there had

---

[154] Docket 23 at 19.

[155] A.R. 27.

[156] Docket 24 at 15. *See also* A.R. 147.

[157] Docket 24 at 17.

[158] A.R. 2.

been a decrease in the medical severity of the impairments present at the time of the CPD.

The medical evidence of record reveals a decrease in treatment for mental health related symptoms. Moreover, neuropsychological testing revealed no more than minimal limitations. Furthermore, [Ms. Gallant]'s treatment records reveal no clinical evidence of significant mental impairment related limitations.[159]

The ALJ's decision contains a thorough discussion of the medical evidence after April 2009 regarding Ms. Gallant's mood and anxiety disorder and traumatic brain injury. Specifically, the ALJ referenced the neuropsychological evaluations conducted by Dr. Fuller in January 2010 and Dr. Cherry in August 2013, as well as the evaluation by consulting psychiatrist David Holladay in January 2012. He noted that the neuropsychological evaluations "revealed normal intellectual functioning, low average to average academic ability, and mildly deficient to average attention and concentration." The ALJ also noted that although Dr. Cherry diagnosed Ms. Gallant with mood disorder, ADHD, migraines, and late effects of intracranial injury, Dr. Cherry "provided no opinion as to specific limitations [Ms. Gallant] may experience as a result of her diagnosed impairments."[160]

The ALJ also noted that at the evaluation by Dr. Holladay, Ms. Gallant "reported that [she] had been off Lexapro for two years and had experienced no mood problems." He referenced Ms. Gallant's counseling records and noted that her "counseling or therapy appears to have stopped in September 2011." He noted that "while Dr. Woods' treatment

---

[159] A.R. 30.

[160] A.R. 35–36.

notes reveal complaints of mood swings, 'forgetfulness,' and difficulty sleeping, Dr. Woods' examination records reveal no significant mental status abnormalities." [161]

In addition, the ALJ considered, and largely discredited, Ms. Gallant's testimony as well as the third party opinions of her mother, friend, and sister. He concluded that the mother's statements regarding Ms. Gallant's "pain, headaches, irritability and other symptoms reasonably related to her medically determinable impairments" are "out of proportion" with the treatment evidence and objective and clinical evidence in the record. He noted that the friend's statements regarding Ms. Gallant's symptoms "did not describe anything that would necessarily result in disabling limitations" and neuropsychological testing did not reveal that Ms. Gallant needs help making decisions. Finally, the ALJ discounted the sister's statements that Ms. Gallant "experiences confusion, memory loss, pain, distractibility, and irritability," and "has difficulty understanding and is socially isolated" because Ms. Gallant "admitted that she is involved in a long-term relationship, and spends time with others singing karaoke, playing pool, and watching movies."[162]

The Court finds that the ALJ adequately applied the correct legal standard and substantial evidence supports his conclusion that Ms. Gallant's traumatic brain injury and mood disorder have improved after the favorable April 22, 2009 disability determination.

3.    *Ability to Work*

Ms. Gallant argues that the ALJ erred because his decision "does not indicate

---

[161] A.R. 36.

[162] A.R. 39.

whether at the comparison point [in 2009], Ms. Gallant had been found disabled based on the Listings or at step 5, and it makes no attempt to reconstruct residual functional capacity for purposes of comparison."[163]

The ALJ's March 21, 2014 decision determined that Ms. Gallant's "medical improvement is related to the ability to work because it has resulted in an increase in [Ms. Gallant]'s residual functional capacity." Specifically, he determined that "[b]ased on the impairments present as of the CPD, the residual functional capacity [Ms. Gallant] has had since April 5, 2012 is less restrictive than the one [Ms. Gallant] had at the time of the CPD."[164]

In the last favorable decision on April 22, 2009, the state agency determined that Ms. Gallant was disabled due to mental limitations and was "not capable of performing other work" considering her "impairment, residual functional capacity, age, and work experience."[165] Although the state agency determination did not specify that it made its decision at Step 5 of the disability determination process, because the agency determined that Ms. Gallant was not capable of performing any work at that time based on her age and work experience, RFC, and mental impairment, it is reasonable to infer

---

[163] Docket 23 at 21. Sections 404.1594(b)(3)(iii) and 416.994(b)(2)(iv)(C) state that "[i]f the most recent favorable medical decision should have contained an assessment of [the claimant's] residual functional capacity (*i.e.*, [the claimant's] impairments did not meet or equal the level of severity contemplated by the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter) but does not, either because this assessment is missing from [the claimant's] file or because it was not done, [the ALJ] will reconstruct the residual functional capacity."

[164] A.R. 30.

[165] A.R. 127–28.

that the state agency used step 5 as the basis for its disability determination.[166]

Additionally, although the ALJ did not specifically reference Ms. Gallant's previous RFC, this error was harmless. First, the ALJ noted that "[a]t the time of the CPD," Ms. Gallant was found to be "unable to maintain adequate pace and persistence on a consistent basis and unable to adequately cope with routine stresses and hassles in the workplace."[167] Second, on April 22, 2009, the state agency determined Ms. Gallant's RFC based on her mental residual functional capacity. She was determined to be "disabled" based on "[m]ental limitations only that are severe enough to preclude all unskilled work."[168]

As part of his analysis of Ms. Gallant's mental impairments to determine her current RFC, the ALJ concluded that Ms. Gallant has mild restriction in daily activities, mild difficulties in social functioning and moderate difficulties with regard to concentration, persistence or pace.[169] He considered objective evidence, including the CT scans taken in 2008 that showed improvement of her traumatic brain injury shortly after the accident, the July 2012 MRA of the circle of Willis and MRI of the brain showing no abnormalities, neuropsychological tests from January 2010 (Fuller), January 2012 (Holladay), and

---

[166] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[167] A.R. 27. Although the ALJ cites an incorrect CPD date earlier in the decision, his language quoted here regarding Ms. Gallant's ability to work mirrors the functional capacity assessment of April 22, 2009. A.R. 131.

[168] A.R. 127–28.

[169] A.R. 29–31.

August 2013 (Cherry), and treatment notes by Dr. Woods from April 5, 2012 through August 2012.[170]

In sum, the ALJ's decision that Ms. Gallant's medical improvement was related to her ability to work was supported by substantial evidence. Therefore, the Court finds a "specific and legitimate inference" that the ALJ compared Ms. Gallant's medical evidence from the date of possible improvement to the medical evidence used to determine that Ms. Gallant was disabled.[171]

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are free from harmless legal error and supported by substantial evidence. Accordingly, IT IS ORDERED that Ms. Gallant's request for relief at Docket 1 is DENIED and the Commissioner's final decision is AFFIRMED.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 19th day of March, 2018 at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[170] A.R. 32–38.

[171] *Attmore,* 827 F.3d at 877 ("[T]he ALJ's references to 'improvement' implied a comparison to [the claimant's] condition during the disability period, which the ALJ had just discussed. We can therefore draw the 'specific and legitimate inference[]' that the ALJ compared the medical evidence from the date of possible improvement to the medical evidence used to determine that [the claimant] was disabled.").